WO                                                                                    MGD

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

Greg Robbins,                                         No.  CV 18-02343-PHX-MTL (DMF)

               Plaintiff,

v.                                                             **ORDER**

Charles L. Ryan, et al.,

               Defendants.

      Plaintiff Greg Robbins, who is currently confined in the Arizona State Prison Complex (ASPC)-Lewis, brought this pro se civil rights action pursuant to 42 U.S.C. § 1983.  (Doc. 1.)  Defendants move for summary judgment, and Plaintiff opposes.[1]  (Docs. 91, 105.)  Also pending before the Court is Plaintiff's request for injunctive relief, which he filed as a part of a Motion for Reconsideration.  (Doc. 109.)

      The Court will grant Defendants' Motion for Summary Judgment in part and deny it in part and will deny Plaintiff's request for injunctive relief.

**I.**    **Background**

      Plaintiff alleges in his Complaint that he seriously injured his knee in 2013 and that a specialist ordered knee replacement surgery, but Defendants refused to provide the surgery or effective pain management.  (Doc. 1.)  Plaintiff seeks damages and costs, as well

---

[1] The Court provided notice to Plaintiff pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc), regarding the requirements of a response.  (Doc. 94.)

as declaratory and injunctive relief, specifically, that Defendants send Plaintiff to an orthopedic specialist and follow that specialist's assessment.  (*Id*. at 20.)

Upon screening under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated an Eighth Amendment medical care claim against Defendants former Arizona Department of Corrections (ADC) Director Charles Ryan and Interim Division Director of Health Services Richard Pratt in their official capacities for prospective injunctive relief; against Corizon Health Incorporated ("Corizon"); and against healthcare providers Dr. Itoro Elijah and Nurse Practitioners (NP) Curtis Bass and Lawrence Ende in their individual capacities.  (Doc. 7.)  The Court required those Defendants to answer the claims against them and dismissed the remaining Defendant and Plaintiff's claim for monetary damages against Ryan and Pratt.[2]  (*Id*.)

## II.     Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything.  *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the burden shifts

---

[2] On July 1, 2019, Centurion of Arizona, LLC ("Centurion") replaced Corizon as the contracted medical care provider for ADC prisoners.  Because Corizon is no longer the medical provider for ADC prisoners, and Plaintiff may not seek *injunctive* relief against it, the Court, in an October 8, 2019 Order, added Centurion as a Defendant and service was completed on Centurion on October 25, 2019.  (Docs. 84, 86.)  Also, because Defendant Ryan is no longer the ADC Director and is being sued in his official capacity for injunctive relief, the Court substituted current ADC Director David Shinn as to Plaintiff's claim for injunctive relief.  (Doc. 108.)

1   to the nonmovant to demonstrate the existence of a factual dispute and that the fact in

2   contention is material, i.e., a fact that might affect the outcome of the suit under the

3   governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable

4   jury could return a verdict for the nonmovant.  *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S.

5   242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th

6   Cir. 1995).  The nonmovant need not establish a material issue of fact conclusively in its

7   favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however,

8   it must "come forward with specific facts showing that there is a genuine issue for trial."

9   *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal

10  citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

11          At summary judgment, the judge's function is not to weigh the evidence and

12  determine the truth but to determine whether there is a genuine issue for trial.  *Anderson*,

13  477 U.S. at 249.  In its analysis, the court must believe the nonmovant's evidence and draw

14  all inferences in the nonmovant's favor.  *Id.* at 255.  The court need consider only the cited

15  materials, but it may consider any other materials in the record.  Fed. R. Civ. P. 56(c)(3).

16  **III.    Relevant Facts**

17          Plaintiff entered ADC custody in July 2007; in the fall of 2009, he was transferred

18  to the Oklahoma Department of Corrections (ODC) as part of the Interstate Compact.

19  (Doc. 89 (Defs.' Statement of Facts) ¶ 1.)  Corizon did not provide health services at the

20  ODC when Plaintiff was housed there, and, under the Interstate Compact, ADC was

21  responsible for payment of any "extraordinary" health expenses for ADC prisoners at ODC

22  that were "beyond the scope of services a primary physician could provide[.]"  (*Id.* ¶¶ 75,

23  76.)

24          In early 2013, while in Oklahoma, Plaintiff injured his left knee while playing

25  basketball.  (Doc. 106 at 217 (Pl. Decl.) ¶ 2.)  In 2014, Plaintiff saw a specialist who

26  "scra[]ped scar tissue" from his left knee.  (*Id.* ¶ 3.)  The following day, Plaintiff fell and

27  re-injured his left knee.  (*Id.*)

28

1      An ODC medical record shows that on October 29, 2014, Plaintiff began "aftercare

2    following surgery for injury and trauma for left knee arthroscopic surgery."  (Doc. 89 ¶ 2.)

3    On December 2, 2014, Plaintiff was seen at Lindsay Municipal Hospital for a left-knee

4    follow-up; he reported he had fallen and still had swelling but his knee was getting stronger.

5    (*Id.* ¶ 3.)

6      On June 3, 2015, Plaintiff was seen at ODC for complaints of an unstable left knee;

7    it was noted that his left knee failed despite surgery and Plaintiff would "return to ortho."

8    (*Id.* ¶ 4.)  On July 21, 2015, Plaintiff was seen by Physician's Assistant (PA) Bernard, who

9    noted that Plaintiff complained of right shoulder and left knee pain and had "mild

10    prepatellar bursal effusion and visible exostosis of the medial joint space [and] he is

11    pending an appt for knee replacement surgery.  Will add voltarin."[3]  (Doc. 106 at 38.)

12      At a September 3, 2015 chronic care visit with Dr. Faubion at ODC's Mack Alford

13    Correctional Center, Plaintiff reported that he received a letter from the Interstate Compact

14    person in Arizona informing Plaintiff that his total knee replacement would be approved.

15    (Doc. 89 ¶ 5.)  Plaintiff told Dr. Faubion he could not walk uphill and upon examination it

16    was noted that Plaintiff's left knee was deformed and had decreased range of motion

17    (ROM).  (*Id.*)  Dr. Faubion spoke with "OSR" and "LMH" regarding a total knee

18    replacement consult and learned it had not been submitted.  (*Id.*)  Dr. Faubion noted "Will

19    do consult to Regional."  (Doc. 89-1 at 12.)  According to Plaintiff, Dr. Faubion made a

20    request to Corizon in Arizona for total knee replacement surgery, but Corizon refused to

21    pay the approximately $90,000 cost for the surgery and instead recommended an

22    alternative treatment plan "to rehabilitate the knee."  (Doc. 106 at 218 ¶ 4.)  Plaintiff tried

23    physical therapy, but it was too painful.  (*Id.*)

24      On December 21, 2015, Plaintiff had an outside specialty appointment at Southwest

25    Orthopedic but "refused" to return to the prison medical department after his appointment

---

27       [3] Voltarin (generic, Diclofenac) is a nonsteroidal anti-inflammatory drug (NSAID)

28    that is used to treat mild-to-moderate pain.  Mayo Clinic, Diclofenac (Oral Route), *available at* https://www.mayoclinic.org/drugs-supplements/diclofenac-oral-route/description/drg-20069748 (last visited May 27, 2020).

1   for further evaluation due to complaints of pain.  (Doc. 89 ¶ 6.)  Plaintiff did not refuse

2   treatment but was in such pain after the physical therapy appointment that he could not

3   walk or hobble anywhere.  (Doc. 106 at 6.)

4      On March 4, 2016, Plaintiff saw Dr. Faubion for his complaints of left knee pain

5   and he asked that his dosage of Neurontin be increased because it only helped for a few

6   hours.[4]  (Doc. 89 ¶ 7.)  Dr. Faubion noted "valgus deformity of knee, antalgic gait, and

7   severe osteoarthritis in the left knee."  (Doc. 89-1 at 16.)  Dr. Fabion planned to increase

8   Plaintiff's Neurontin and said Plaintiff must come twice a day "for improved pain relief."

9   (*Id*.)  He also discussed with Plaintiff the "recommendation from AZ regarding PT

10  [physical therapy] before surgery.  Informed pt [patient] he was being scheduled for this."

11  (*Id*.)

12     On September 2, 2016, Plaintiff saw Dr. Thompson at ODC's North Fork

13  Correctional Center for his left knee complaints.  (Doc. 106 at 40.)  Upon examination, Dr.

14  Thompson noted "left knee still gives way, C/O [complains of] pain unrelieved by meds

15  and rest, first injury playing basketball in 2012 with intermittent exacerbations.  Demands

16  Neurontin."  (*Id*.)  Dr. Thompson's plan was for NSAIDs, to "restart ortho consult process,

17  add prednisone for now, RX Voltaren."  (*Id*.)

18     On October 4, 2016, Plaintiff saw Dr. Balogh at ODC's North Fork Correctional

19  Center for an evaluation of his knee and nerve pain.  (Doc. 89-1 at 18.)  Plaintiff told Dr.

20  Balogh that his knee hurt, he had burning pain in his legs, that nothing helped, and he

21  wanted Neurontin.  (*Id*. at 20.)  Plaintiff asked about his knee replacement and said

22  "Arizona needed more specific information about how bad his knee is."  (*Id*.)   Upon

23  examination, Dr. Balogh noted "knees somewhat deformed, he is able to ambulate with a

24  cane," and "rom of knees somewhat decreased."  (*Id*.)  Dr. Balogh assessed Plaintiff with

25  degenerative joint disease of the knees and possible neuropathic pain.  (*Id*.)  Dr. Balogh

26  _____

27         [4] Neurontin (Gabapentin) is an anticonvulsant that is used to prevent seizures and
    relieve pain for certain nervous system conditions.  Mayo Clinic, Gabapentin (Oral Route),
28  *available       at*       https://www.mayoclinic.org/drugs-supplements/gabapentin-oral-
    route/description /drg-20064011 (last visited May 27, 2020).

1  wrote that he was not going to restart Neurontin and he offered Plaintiff Cymbalta for nerve

2  pain.[5]  Dr. Balogh remarked that he did "see a consult from an orthopedist" in Ada,

3  Oklahoma, that he would attempt to get Plaintiff back to see the orthopedist in Ada, and

4  that Plaintiff's home state would have to be involved in approving any surgery.  (*Id*.)

5      In a Consult Request dated October 4, 2016, Dr. Balogh sought authorization for an

6  orthopedic surgery consultation "to evaluate for left tkr [total knee replacement]."  (Doc.

7  106 at 42.)  Dr. Balogh wrote that Plaintiff had a history of "polytrauma with old left knee

8  injury" and that he was seen "by ortho in Ada, Oklahoma while housed at Mack Alford

9  facility who recommended left TKR in Dec 2015.  He transferred to NFCC summer 2016.

10  He is a contract prisoner with state of Arizona who will need approval from Arizona to

11  proceed with any surgery."  (*Id*.)   Under Functional Limitations, Dr. Balogh noted

12  "ambulation is limited unless he can use a cane," "rom of left knee is severely

13  compromised," and "left knee is not stable to stressing." (*Id*.)  A comment on the document

14  states: "Utilization: Need more information," and asked, "Is Arizona responsible approval

15  and financial payment of the procedure?  Also when is sentence completed and how long

16  has he had this problem?  How active is he and what is his employment?"  (*Id*.)  The

17  document indicates that the Consult Request was canceled.  (*Id*.)  A separate ODC medical

18  record also indicates that an orthopedic clinic appointment for Plaintiff at OUMC was

19  canceled and to "please reschedule with outside provider."  (*Id*. at 44.)

20      Plaintiff provides a letter dated November 3, 2016 that he wrote to Tom Lyerla, who

21  apparently was the Interstate Compact contact person in Arizona; Plaintiff attached photos

22  of his knee and said, "Tom, this is what's left of my knee.  I can't go through any kind of

23  therapy.  I'm in so much pain 24/7.  Tylenol is all they are giving me here and they still

24  have not given me a wheelchair.  I need you to get this knee replacement approved

25

26  _____

27      [5] Cymbalta (Duloxetine) is used to treat depression, anxiety, pain caused by nerve

28  damage, and chronic pain that is related to muscles and bones.  Mayo Clinic, Duloxetine
   (Oral Route), *available at* https://www.mayoclinic.org/drugs-supplements/duloxetine-
   oral-route/description/drg-20067247 (last visited May 27, 2020).

1   immediately before this causes further injury to me.  It's already affected my hip and

2   an[k]le.  I can't take much more—my pain is extreme.  Please help me!"  (*Id*. at 163.)

3         On December 21, 2016, Plaintiff saw Dr. West at Southwest Orthopedic and Dr.

4   West told Plaintiff that he needed a complete knee replacement because his "left knee was

5   shot, with big pieces of broken bone, and ligaments that could not be re-attached."  (*Id*. at

6   218 ¶ 5.)  At that time, Plaintiff could barely walk with a cane, had level 10 pain, could not

7   sleep, and his left knee was swollen 3 to 4 times the size of his right knee.  (*Id*.)  Plaintiff

8   was scheduled for total knee replacement surgery in 2017 but was transferred back to ADC

9   in April 2017 before that happened, and his medical records from Oklahoma did not follow

10   him to Arizona.  (*Id*.)

11         On April 7, 2017, Plaintiff returned to ADC custody in Arizona and was assessed

12   by Nurse Patterson during intake.  (Doc. 89 ¶ 9.)  Plaintiff reported that he had knee

13   arthroscopy on his left knee in 2015 but fell afterwards, which further injured his knee, and

14   that he had no corrective surgery after that.  (*Id*.)  The nurse noted Plaintiff's gait as steady

15   with a small limp, a left knee deformity compared to the right, mobility

16   restriction/impairments, and that Plaintiff used a cane.  (*Id*.)  Plaintiff was referred to the

17   provider line.  (*Id*.)  No active prescriptions were listed in Plaintiff's record on that date.

18   (Doc. 89-1 at 24.)

19         On April 9, 2017, Plaintiff submitted a Health Needs Request (HNR) asking to be

20   seen for pain management and to be scheduled for knee replacement.  (Doc. 106-1 at 76.)

21   Plaintiff said he injured his knee in 2013 and had several falls afterwards which caused

22   further injury, "bone on bone," and now another piece of bone had broken off.  (*Id*.)  The

23   response says, "seen by nursing."  (*Id*.)

24         On April 10, 2017, Plaintiff saw Nurse Gamble for knee pain, and Gamble observed

25   that Plaintiff ambulated with a cane, had asymmetrical knees, and his left kneecap was

26   larger than the right.  (Doc. 89 ¶ 10.)  Plaintiff rated his pain that day at 7 on a scale of 10

27   and 10/10 at its worst.  (Doc. 89-1 at 28.)  A Special Needs Order (SNO) for a walking

28

1    cane was written.  (Doc. 89 ¶ 10.)  No active prescriptions were listed in Plaintiff's medical
2    record on that date.  (*See* Doc. 89-1 at 30.)

3        On April 25, 2017, Plaintiff submitted an HNR for x-rays on his shoulder, knee and
4    ankles due to falls, and he asked to see a specialist.  (Doc. 89 ¶ 11.)  On April 26, 2017,
5    Nurse Hartsough saw Plaintiff, and Plaintiff reported that he had previously received x-
6    rays and physical therapy but did not complete the therapy due to pain.  (*Id.* ¶ 12.)
7    Hartsough observed that Plaintiff's left knee was swollen with obvious deformity and
8    limited ROM and that Plaintiff had non-erect posture and asymmetrical gait.  (*Id*.)  The
9    plan was to have x-rays taken of Plaintiff's shoulder, left knee, and ankle, and for Plaintiff
10   to follow-up with a provider.  (*Id*.)  No active prescriptions were noted in Plaintiff's
11   medical record.  (Doc. 89-1 at 41.)

12       Plaintiff had x-rays taken of his left knee on May 6, 2017, which showed "[n]o
13   fracture or destructive process.  Pending AP view.  Degenerative changes in lateral view
14   presented."  (*Id*. at 45.)  A note dated May 7, 2017 by Defendant Ende states "abnormal,
15   no action indicated."  (*Id*.)

16       On May 7, 2017, Plaintiff saw Nurse Wilson for his complaints of knee pain; it was
17   noted that Plaintiff ambulated with a cane, that his left knee had an obvious deformity and
18   bowed out, was tender to touch, and had limited ROM.  (Doc. 89 ¶ 15.)  Plaintiff rated his
19   pain at 8/10 that day and 10/10 at its worst.  (Doc. 89-1 at 49.)  Wilson assessed Plaintiff
20   with "risk for impaired mobility secondary to use of cane" and "alteration in comfort
21   secondary to left knee pain aeb [sic] stated per patient."  (*Id*. at 50.)  Imipramine was
22   prescribed and medical ice ordered for 3 days.[6]  (*Id*. at 51.)

23       On May 12, 2017, Plaintiff submitted an Inmate Grievance about not seeing a doctor
24   for his pain.  (Doc. 89 ¶ 16.)  Plaintiff wrote that he had not seen a doctor yet, only received
25   medical ice once, was in extreme pain and that medical was aware of his multiple injuries.
26   (Doc. 89-1 at 56.)  Plaintiff asked to see a doctor immediately.  (*Id*.)  Facility Health

27   
28        [6] Imipramine is a tricyclic antidepressant used to treat depression.  Mayo Clinic,
     Imipramine (Oral Route), *available at* https://www.mayoclinic.org/drugs-supplements
     /imipramine-oral-route/description/drg-20072148 (last visited May 27, 2020).

Administrator (FHA) Rogers responded on May 16, 2017 that Plaintiff's medical record showed Plaintiff had been seen by the "medical team," received x-rays, was assessed by the nurse, and had an upcoming appointment with the provider. (*Id*. at 55.)

On May 23, 2017, Plaintiff filed an HNR requesting pain management for the pain in his left shoulder and right ankle, two pieces of broken bone in his kneecap, and an old gunshot wound to the spine that caused nerve damage from the waist down. (*Id*. at 58.)

On May 26, 2027, Plaintiff saw Registered Nurse McDuffee for "multiple orthopedic concerns." (*Id.* at 60.) McDuffee noted "multiple injuries including GSW [gun shot wound] to spine, basketball injury to left knee, multiple falls on right shoulder." (*Id*. at 61.) Plaintiff rated his pain that day as 8/10 and said he had taken Neurontin (Gabapentin) prescribed by a neurosurgeon in the past and it "makes life tolerable." (*Id*. at 60, 64.) Plaintiff had an active prescription for Imipramine and was told to use over-the-counter Ibuprofen as needed. (*Id*. at 62.)

On May 31, 2017, Plaintiff submitted an HNR stating that he was in extreme pain and while he had seen 3 or 4 nurses, he still had not seen a doctor for appropriate pain medication and to start the process for knee replacement. (Doc. 106-1 at 84.)

On June 7, 2017, Plaintiff saw Defendant Dr. Elijah. (Doc. 89 ¶ 19.) Plaintiff reported that he had a patellar fracture in March 2013, and it had been surgically repaired, but he fell the day after surgery, and an orthopedist recommended a knee replacement. (*Id*.) Plaintiff wanted to follow up on the left knee plan of care provided in Oklahoma and they discussed obtaining the records of his care in Oklahoma. (*Id*.) Plaintiff said he could not straighten his left knee, had intermittent swelling, and used a knee brace and cane. (*Id*.) Upon examination, Dr. Elijah noted an "obvious deformity" in the left knee with fluctuant swelling, a "notable increase in bony area at distal portion of femur vs. patella," left knee "significantly larger than right knee," patella not palpable due to swelling, ROM limited due to swelling and reported pain, and unable to "fully extend." (Doc. 89-1 at 66.) Plaintiff also reported low back and hip pain due to a gunshot wound to the spine and he requested Tylenol #3, Tramadol, Gabapentin or Baclofen for his pain. (*Id*.) Dr. Elijah said there was

no medical indication for those pain medications and offered Plaintiff alternatives such as Nortriptyline, Cymbalta, and various NSAIDs. (*Id*.) Plaintiff said he had an allergic reaction to Naproxen and requested Ibuprofen to help with knee swelling. (*Id*.) Plaintiff had an active prescription for Imipramine for pain and Dr. Elijah also prescribed capsaicin cream and Ibuprofen 600 mg three times daily for pain, ordered labs, including a rheumatoid profile, and a left knee brace. (*Id*. at 68.) Dr. Elijah's plan was to review the records from Oklahoma once they were received and then follow up to discuss a plan of care with Plaintiff. (*Id*.)

On August 24, 2017, Plaintiff submitted an HNR asking if medical had received his ODC medical records and if he was scheduled to see a specialist about his knee. (*Id*. at 70.) Nurse Agostini reviewed Plaintiff's chart that same day and noted that Plaintiff filled out the form for his ODC medical records two months earlier and he was scheduled to be seen on the provider line. (*Id*. at 74.)

On September 8, 2017, Plaintiff saw Dr. Theodora Paul. (Doc. 89 ¶ 22.) Plaintiff told Dr. Paul that he was worked up in Oklahoma for possible left knee replacement, went through physical therapy but fell and reinjured his knee, and that he had signed a release for his ODC medical records two months earlier but had heard nothing since. (Doc. 89-1 at 76.) Dr. Paul observed that Plaintiff's gait was antalgic and he ambulated with a cane, his left knee was visibly different from the right, there was no redness or effusion, but there was a protruding bony area to left medial knee. (*Id*.) Dr. Paul wrote that she was unable to do a complete knee exam as Plaintiff was "uncooperative," would stiffen his left leg, and resisted passive ROM. (*Id*.) Although Plaintiff had signed a release for his Oklahoma records, Dr. Paul noted they were not available, and Plaintiff was "made aware that workup may have to start all over again." (*Id*. at 77.) Dr. Paul ordered x-rays of the left knee. (*Id*. at 79.)

X-rays were taken on September 8, 2017, and they showed "circumscribed medial malleolar density suggests old injury with degenerative change and medial compartmental narrowing" as well as "medial malleolar avulsion and degenerative changes." (*Id*. at 81.)

Dr. Paul reviewed the x-ray results, noting that "x-ray was needed to start work up for IM to have ortho eval for knee replacement" and "Plan awaiting receipt of previous medical records." (*Id.*)

On September 28, 2017, Plaintiff submitted an HNR stating: "To the Doctor, you forgot to do the medical release form for Oklahoma. I'm in a lot of pain and hope you can get the form sent to me and I can sign it and send it back. I just want the process to get started[;] my knee has been like this since 3/3/2013." (Doc. 89-1 at 83.) Dr. Paul noted Plaintiff's HNR in his medical chart on October 3, 2017, and wrote: "medical records were not obtained from OK, a completed release of information will be sent for IM to sign." (*Id.* at 87.)

On October 4, 2017, Plaintiff submitted an HNR stating that Ibuprofen was not strong enough for his knee pain. (Doc. 106-1 at 91.) On October 5, 2017, Plaintiff saw Nurse Ayiyi for his knee pain; Plaintiff said Ibuprofen was ineffective and asked to change to a different pain medication. (Doc. 89-1 at 92.) Plaintiff was advised to use warm compresses, exercise and continue with Ibuprofen for now. (*Id.* at 93.) Plaintiff had active prescriptions for capsaicin cream, Ibuprofen 600 mg three times daily, and Imipramine 25 mg daily. (*Id.*)

On October 17, 2017, Plaintiff saw Defendant NP Bass to provide Plaintiff with a release of information to request his knee arthroscopy workup from Oklahoma. (*Id.* at 97.) Plaintiff reported left leg chronic pain, numbness, tingling, weakness and gait problems and asked to change his Ibuprofen to Indomethacin.[7] (*Id.*) Upon examination, Bass noted "no clubbing/cyanosis, full ROM, no deformity, no edema. Using a cane and a knee brace (left knee)." (*Id.* at 98.) Bass assessed Plaintiff as "clinically stable. Left knee deformity." (*Id.*) Bass prescribed Indomethacin three times daily as needed in addition to Plaintiff's

---

[7] Indomethacin is a NSAID used to treat mild to moderate acute pain and to relieve symptoms of arthritis and gout such as inflammation, swelling, stiffness, and joint pain. Mayo Clinic, Indomethacin (Oral Route), available at https://www.mayoclinic.org/drugs-supplements/indomethacin-oral-route/description/drg-20069700 (last visited May 27, 2020).

active prescriptions for capsaicin cream, Ibuprofen 600 mg three times daily, and Imipramine. (*Id*.)

On January 15, 2018, Plaintiff filed an HNR asking to see a specialist to evaluate his knee and stating that he had twice filled out medical releases for his Oklahoma records. (*Id*. at 101.) Plaintiff wrote that he was in extreme pain and that the delay in treatment was causing further damage and arthritis in his hip and back. (*Id*.) The response from RN McDuffee states that Plaintiff was scheduled to see the provider. (*Id*.)

On January 30, 2018, Plaintiff saw NP Bass to "reassess left knee and status of requested documentation from pre-arthroplasty workup."[8] (*Id*. at 106.) Plaintiff told Bass he had been prepped for left knee arthroplasty while incarcerated in Oklahoma, but was transferred to Arizona before surgery occurred, and that his pain now was constant and affected all activities of daily living (ADLs). (*Id*.) Bass noted that he had submitted a release of information for Plaintiff's Oklahoma records to the medical records staff on October 17, 2017. (*Id*.) Bass observed that Plaintiff walked with a pronounced limp and antalgic gate and was wearing an articulated brace on his left knee. (*Id*.) The brace was removed for examination and Plaintiff was unable to extend his knee to 180 degrees or flex his knee to 90 degrees and Plaintiff grimaced with manipulation. (*Id*.) Bass noted no erythema or effusion but there was a "marked deformity." (*Id*.) Bass assessed Plaintiff with "left knee pain/deformity" and re-prescribed Ibuprofen 600 mg three times daily as needed. (*Id*. at 107.) Bass's plan was to check on the medical records and to initiate a consult request for an MRI if the previous imaging from Oklahoma had not arrived. (*Id*.)

In a February 13, 2018 HNR, Plaintiff wrote that his back and hip on the right side "keep going out," he was experiencing pain, and his feet were killing him. (Doc. 106-1 at 95.) The response says, "nurse line scheduled" and "provider review scheduled." (*Id*.)

---

[8] Arthroplasty is also known as knee replacement surgery. Mayo Clinic, Knee Replacement, *available at* https://www.mayoclinic.org/tests-procedures/knee-replacement/about/pac-20385276 (last visited May 27, 2020).

On March 11, 2018, NP Bass submitted a consultation request for an off-site "Radiology-MRI, UltrSnd, CAT." (Doc. 89-1 at 110.) The request was denied and LPN Garner entered an Alternative Treatment Plan (ATP) stating:

> CT would not be medically necessary, as notes indicate that advanced imaging was previously performed and that there has not been any acute change or deterioration that would require new or repeat imaging. Consider continued attempts to obtain prior MRI report, as well as educating the patient on ROM and strengthening exercises, activity modification, and conservative pain control measures.

(*Id.*)

On March 23, 2018, Plaintiff saw NP Bass to discuss the ATP and "refusal of UM [Utilization Management] to authorize CT." (*Id.* at 112.) Bass did not examine Plaintiff but observed that he was ambulatory with a cane and had a pronounced limp. (*Id.*)

On March 25, 2018, Plaintiff filed an Inmate Informal Complaint Resolution about not receiving a CT scan or MRI for his knee. (*Id.* at 116.) Plaintiff wrote that he did receive an MRI in 2015 but those medical records seem to either be misplaced or lost and that he had been trying to get his knee fixed for five years. (*Id.*) Plaintiff said he suffers agonizing pain every time he walks, and he asked for pain management treatment until his old MRI records are located or that he receive a new MRI/CT scan to properly diagnose the damage to his knee. (*Id.*)

In an Inmate Grievance dated May 14, 2018, Plaintiff wrote that due to his knee he continues to suffer excessive and debilitating pain, swelling, decreased ROM, crepitus, balance and gait issues. (Doc. 106-1 at 83.) Plaintiff said he risks further injury throughout his foot, leg, lower back, and hip, and his existing arthritis is greatly exacerbated. (*Id.*) Plaintiff wrote that these conditions adversely affect his daily life activities and substantially limit his strength, endurance, walking, standing, and bending. (*Id.*) Plaintiff requested an MRI, effective treatment by a specialist, and pain management. (*Id.*)

On May 30, 2018, FHA Rankin responded to Plaintiff's Inmate Grievance. (Doc. 89-1 at 118.) Rankin said that after a review of Plaintiff's medical records, it appeared that

Plaintiff had not seen a provider for his knee pain since October 15, 2017 and that she was scheduling Plaintiff to be re-evaluated.[9]  (*Id*.)

On June 5, 2018, Plaintiff saw NP Bass for his continued complaints of chronic knee pain and debility.  (*Id*. at 121.)  Plaintiff reported that he had increasing pain in his hip and ankle secondary to his unnatural gait, had lost 15 pounds in the previous three months, and was increasingly depressed.  (*Id*.)  Bass noted that Plaintiff was ambulatory with a cane and had a pronounced limp with an obvious deformity in the left knee and limited flexion of his left knee.  (*Id*.)  Bass assessed Plaintiff with "difficulty in walking, not elsewhere classified" and "pain in left knee."  (*Id*. at 122.)  Plaintiff had active prescriptions for Imipramine and Ibuprofen and Bass noted that the prior request for an MRI was "ATP'd" and that he would submit a request "for an ortho evaluation secondary to x-ray results." (*Id*.)

On June 16, 2018, Bass submitted a Consultation Request for off-site orthopedics. (Doc. 89-1 at 128.)  The request was denied and an ATP entered by LPN Garner stated:

> Surgical intervention would not be medically necessary at this time, as notes don't indicate that conservative management options have been trialed [sic].  Consider a HEP [home exercise program] regimen and/or PT [physical therapy], and reserving orthopedic consult for severe pain that is uncontrolled despite nonsurgical options or an inability to carry out ADLs due to pain or ROM limitations.

(*Id*.)

Defendant NP Ende met with Plaintiff on June 26, 2018 to inform him of the ATP. (*Id*. at 130.)  Ende noted that Plaintiff's left knee was "grossly deformed, ROM extension 180 degrees, flexion 90 degrees, crepitus with movement, ambulates with limp using cane." (*Id*.)  Ende ordered x-rays of Plaintiff's left knee.  (*Id*. at 131.)  At that time, Plaintiff had prescriptions for Ibuprofen 600 mg three times daily and Imipramine, and Ende states in his Declaration that Plaintiff did not tell him those medications were not controlling his

---

[9] Defendants assert that the date is incorrect and that Plaintiff was seen on January 30, 2018 for assessment of his knee.  (Doc. 89 at 9 n.4.)

pain, and Ende did not think it was medically appropriate to add any other medications at that time.  (*Id*. at 245 ¶¶ 6-8.)  Also, Ende did not think it would be fruitful to immediately request another orthopedic consultation because the alternative therapies recommended (home exercise program and/or PT) had not been tried yet.  (*Id.* ¶ 9.)  Plaintiff states that Ende knew that the ATP was not acceptable "because the need for specialist was obvious" and that "Ende knew by Plaintiff's medical record that home exercises would not work, and Plaintiff's "prior HNR, and informal and formal grievances that he was in severe level (10) pain as he was taking the prescribed medications."  (Doc. 106 at 32.)

On June 22, 2018, Plaintiff submitted an HNR requesting a specialist or "ortho doctor" to evaluate his knee.  (Doc. 106-1 at 97.)  Plaintiff wrote that FHA Rankin had said Plaintiff would be scheduled for a re-evaluation of his chronic knee injury, but he had not been seen yet.  (*Id*.)

X-ray were taken of Plaintiff's knees on July 2, 2018 and the results showed "[d]egenerative changes, medial compartmental narrowing and prior avulsion is again noted with no acute changes compared to 091117[.]  DJD with prior medial tibial plateau avulsion."  (Doc. 89-1 at 134.)  A comment on the x-ray report by Nancy Ochoa states, "externally visual appearance is grossly deformed compared with right knee."  (*Id*.)  Defendant NP Ende noted on July 8, 2018: "abnormals noted, no urgent action required, communique to inmate" and "will review results with patient at next chronic care visit."  (*Id*.)

On July 6, 2018, Plaintiff submitted an HNR addressed to Ende stating that he cannot do the knee conditioning program without injuring his knee and perhaps his back, hip and ankle.  (*Id*. at 136.)  Plaintiff said he experienced extreme pain day and night and needed "immediate medical attention by a doctor or specialist.  You can look at my knee and see it's badly damage[d].  Please get me help!  (*Id*.)  RN McDuffee wrote in response that Ende had informed Plaintiff via communique that the x-rays required no urgent action and Ende would discuss the issue with Plaintiff at his next chronic care visit.  (*Id*.)

In an HNR dated July 8, 2018, Plaintiff asked if Ende would follow up on Plaintiff's knee and extreme pain, which kept him up all hours of the night, and he wrote that he was experiencing numbness in his feet and "knee burning all the time." (Doc. 106-1 at 101.) The response from RN McDuffee states that Plaintiff was seen by the provider on June 26 for this. (*Id.*)

In an HNR dated September 16, 2018, Plaintiff wrote about his chronic knee pain and that he needed a wheelchair because he could not walk due to his knee. (Doc. 89-1 at 138.) Plaintiff said the pain was unbearable even lying down and that the only relief was when he sat in a chair and did not move. (*Id.*) Plaintiff said he "can't keep this up. I'm begging you to help me deal with this issue, please!" (*Id.*) The response from RN McDufee stated, "you are scheduled w/ provider." (*Id.*)

On September 21, 2018, Plaintiff saw NP DeMello about his left knee pain and reported that he did one session of "rehab/PT," but it was too traumatic and painful to continue, and that there had been many unsuccessful attempts to get his records from Oklahoma. (*Id.* at 140.) Plaintiff told DeMello that he had surgery after suffering a patellar fracture in March 2013, that he fell after the surgery and an x-ray showed bone fragments from a new injury, and an "ortho" "recommended a full knee replacement," but he was transferred to Arizona before he could have the surgery. (*Id.*) Plaintiff reported that his pain was constant at "9/10+," he was unable to walk long distances, he had difficulty standing for long periods of time, difficulty in tending to his ADLs in one sitting, and had to take breaks to give his knee a rest. (*Id.*) Plaintiff said the pain had increased with "snapping, cracking and other grinding feelings in [his] knee." (*Id.*) DeMello observed that Plaintiff's left knee "is visibly different from right, significantly larger with bony prominences." (*Id.*) She wrote that it was difficult to evaluate Plaintiff and that he "would stiffen leg or resist passive rom and grimace and grunt, making statements of how much pain he was in or that h[is] knee was on fire." (*Id.*) DeMello offered Plaintiff Cymbalta, Nortriptyline, and Topamax but Plaintiff said he had tried all those medications and none of them worked, but he eventually asked to start Cymbalta. (*Id.*) DeMello assessed

Plaintiff with "left knee pain" and planned to discontinue Ibuprofen because Plaintiff said it was not effective and to try Mobic and Cymbalta. (*Id*. at 141–142.) DeMello offered Plaintiff a home exercise program but Plaintiff said he had too much pain to do the exercises. (*Id*.) Plaintiff asked for a wheelchair, but DeMello told Plaintiff that he does not have a condition that necessitates a wheelchair. (*Id*. at 140, 142.)

DeMello submitted a Consultation Request that day for "MRI, UltrSnd, CAT." (*Id*. at 143.) The request was denied; an ATP entered by LPN Garner states, "Medical necessity not demonstrated. Consider a [home exercise program] regimen and/or PT." (*Id*.)

On October 16, 2018, Plaintiff met with DeMello to discuss "ATP regarding MRI of knee." (*Id*. at 145.) DeMello noted that Plaintiff was unhappy with the ATP and that he said he had been doing a home exercise program since June 2018, but his pain had increased and was not improving. (*Id*.) DeMello planned to discontinue Meloxicam, start Ibuprofen 600 mg three times daily, use analgesic cream as needed, and refer Plaintiff to physical therapy. (*Id*. at 146–47.) That same day, DeMello submitted a Consultation Request for off-site physical therapy. (*Id*. at 148.)

A Corizon Authorization Letter dated October 17, 2018 indicates that Plaintiff was authorized to have one off-site physical therapy visit. (*Id*. at 152.) In the section of the form reserved for the consulting physician, L. Diebler wrote on November 29, 2018, that "patient is a 54 [year old male with] a history of L knee pain for 5 years. [Patient's] ROM is limited to -20-35 [degrees] . . . . Pt states pain @ 10/10. Pt states physician states he needs a TKR [total knee replacement] A.S.A.P. Pt c/o [complains of] bone on bone pain [a]ffecting his health-safety." (*Id*.) Deibler's recommendation was for Plaintiff to continue physical therapy for 6 to 8 visits "for a pre-surgery strengthening program." (*Id*.)

On December 10, 2018, Plaintiff submitted an HNR stating that he needed a wheelchair because his knee was swollen and "hurts really bad to walk on." (*Id*. at 154.) Plaintiff saw RN McDuffee that day and McDuffee noted that Plaintiff's left knee was warm and "swollen at least twice as large as left [sic] knee." (*Id*. at 156.) McDuffee assessed Plaintiff with "[a]lteration in comfort r/t left knee pain," prescribed capsaicin

cream, gave a three-day order for Plaintiff to have his meals in his housing, medical ice, and a knee sleeve.  (*Id*. at 157.)

On December 12, 2018, NP DeMello submitted a Consultation Request for off-site physical therapy, noting "[r]eferral to PT—eval completed, recommendation for 8 session[s] for pre-surgery strengthening."  (*Id*. at 161.)  That request was approved for 8 visits on December 18, 2018.  (*Id*. at 162, 170.)

On January 31, 2019, Plaintiff saw NP McElroy for his chronic knee pain that was not improving.  (*Id*. at 165.)  Upon examination, McElroy observed that Plaintiff had only 20-35 degrees flexion with the left knee and then only with extreme pain.  (*Id*.)  McElroy attempted "posterior and anterior drawer," but was unsuccessful due to "rigidity of knee and increased pain and unable to laterally or medially flex knee with Lachman maneuver [due to] decreased ROM and extreme pain."  (*Id*.)  Plaintiff had active prescriptions for capsaicin cream, analgesic balm, and Ibuprofen, and McElroy prescribed Tramadol twice daily as needed and increased the strength of capsaicin cream.[10]  (*Id*. at 166.)  McElroy planned for Plaintiff to "continue with physical therapy as able" and use a "wheelchair for compromised ADL's and difficulty with mobility," and she noted she would recommend an MRI of the knee and a follow-up with orthopedics if indicated by the MRI because Plaintiff "has failed conservative management and continues to have uncontrolled pain with no relief or improvement in knee function."  (*Id*. at 167.)

That same day, McElroy submitted a Consultation Request for "MRI, UltrSnd, CAT."  (*Id*. at 164.)  The request was denied and LPN Garner entered an ATP stating: "MRI would not be medically necessary, as the patient is noted by x-ray to have DJD.  PT visits have been approved, but only the evaluation has taken place so far.  Consider moving forward with course of PT followed by re-assessment."[11]  (*Id*.)

---

[10] Tramadol (brand name, Ultram) is used to relieve moderate to moderately severe pain and the extended-release capsules or tables are used for chronic pain.  Mayo Clinic, Tramadol (Oral Route), *available at* https://www.mayoclinic.org/drugs-supplements/tramadol-oral-route/description/drg-20068050 (last visited May 27, 2020).

[11] Defendants state that the consultation request was denied by the Utilization Management Team.  (Doc. 89 ¶ 46.)

On February 8, 2019, Plaintiff saw NP McElroy for his chronic knee pain, which was not improving.  (*Id*. at 172.)  Plaintiff reported that he was having extreme difficulty with physical therapy, felt it was making his pain worse, and had not improved his ROM. (*Id*.)   McElroy noted that physical therapy recommended "continuing for pre-op strengthening especially if surgery is planned however their last note stated that it is bone on bone and that there is limited possibilities of rehab." (*Id*.)  Upon examination, McElroy found that Plaintiff's left knee was unchanged from the last visit except that it was "even more tender to touch with 10/10 pain especially after physical therapy visit yesterday." (*Id*.)  McElroy assessed Plaintiff with "left knee DJD with bone on bone."  (*Id*. at 173.) McElroy planned to recommend an MRI of the knee, referral to a surgeon, a wheelchair, physical therapy as able, and Ultram (Tramadol) for pain.  (*Id*. at 174.)

McElroy submitted a Consultation Request for the MRI that same day, but it was denied and an ATP recommended an orthopedic evaluation.  (Doc. 89 ¶ 48.)  The "Action Taken Comments" on the consultation request state:

> Last 2 physical therapy notes show that IM has palpable bony protrusion with physical bone on bone crepitus on exam and last xray with DJD and medial compartment narrowing — physical exam correlates with PT and xray for bone on bone — IM with progressive inability now to weight bear and ambulate on knee even with brace [due to] grinding and increased pain — Per PT and per provider IM is a candidate for TKA evaluation for TKA vs MRI which orthopedics would likely want.

(*Id*. at 175.)

At a physical therapy appointment on February 12, 2019, L. Deibler noted that Plaintiff had continued pain in the left knee with severe atrophy and that Plaintiff was a candidate for total knee replacement.  (*Id*. at 177.)  The same note about Plaintiff being a candidate for total knee replacement was made at a February 14, 2019 physical therapy appointment.  (*Id*. at 179.)

On February 18, 2019, NP McElroy submitted a Consultation Request for an off-site orthopedics visit to evaluate Plaintiff's knee and possible surgery. (*Id*. at 181.) The record indicates that the request was approved. (*See id*. at 182.)

At a February 19, 2019 physical therapy session, L. Diebler noted no changes, that Plaintiff ambulated with an altered gait, and weight bearing was becoming more difficult. (*Id*. at 184.) Plaintiff saw NP McElroy that same day to discuss the ATP for an orthopedic evaluation in lieu of an MRI. (*Id*. at 185.) Upon examination, McElroy noted no change from the last exam except that the knee was even more tender to touch with 10/10 pain especially after physical therapy. (*Id*.) McElroy prescribed medical ice, recommended that Plaintiff continue with physical therapy as able to help with pre-op strengthening, if surgery is indicated. (*Id*. at 187.) She also noted that she would recommend an MRI of the knee and then referral to a surgeon "however ATP of MRI again so will refer directly to orthopedics and will attempt to get the MRI that now has been requested 3 times from Oklahoma done in 2015." (*Id*.)

At his fifth physical therapy appointment on February 21, 2019, L. Diebler noted that Plaintiff still had 10/10 pain, decreasing ROM, no quad control, and "since Pt [patient] unable to extend knee—TKR/ortho-consult A.S.A.P." (*Id*. at 190.) At his sixth appointment on February 26, 2019, Plaintiff reported that he had fallen due to his knee giving way and that the pain, at 10/10, was getting worse. (*Id*. at 192.) Diebler noted "needs TKR—starting to be a safety issue due to instability." (*Id*.) At a February 28, 2019 physical therapy session, Diebler again noted "needs TKR A.S.A.P." (*Id*. at 194.) At Plaintiff's last physical therapy visit on March 5, 2019, Diebler again noted that Plaintiff was a candidate for total knee replacement. (*Id*. at 196.)

In a March 14, 2019 HNR, Plaintiff requested an increase in his Tramadol dosage because he was in constant pain and the pain medication did not last through the night. (*Id*. at 198.) RN McDuffee increased Plaintiff's Tramadol dosage that day to 50 mg, one to two tablets, twice daily. (*Id*. at 200).

On March 19, 2019, Plaintiff had an off-site orthopedics appointment with Dr. John Wheeler at Banner Health who reviewed x-rays taken that day and assessed Plaintiff with "fracture of medial plateau of left tibia," "left medial tibia plateau, nonunion," acute knee pain, and osteoarthritis. (*Id*. at 203–204.) Dr. Wheeler referred Plaintiff to Dr. Woodruff to discuss a possible left total knee replacement. (*Id*. at 203.)

On March 21, 2019, Dr. Paul, submitted a Consultation Request for an off-site orthopedics visit, noting:

> IM [inmate] with known DJD and bone on bone and will likely require total knee surgery as he is severely compromised in ADL's and in 10/10 pain. He has failed conservative treatment including PT – PT notes that there is little they can do but recommend continuing only for strengthening of quad muscles in anticipation of surgery[.] MRI has now been ATP'ed x 2 and recommendations to try PT first has now been done and is not working. Per last ATP will recommend Pt to go directly to orthopedics.

> IM has been seen by orthopedics and the following recommendation has been made: TOTAL KNEE REPLACEMENT REFER TO DR. WOODRUFF. Please authorize this consult.

(*Id*. at 206.) The document does not indicate if this request was approved or not but says "Referred to UM Team for Review" on March 22, 2019.[12] (*Id*.)

On April 2, 2019, Dr. Paul ordered a chest x-ray "for pre-op."[13] (*Id*. at 208.)

---

[12] Defendants do not provide evidence that the surgery was approved, although it apparently was because Plaintiff did have total knee replacement surgery on July 1, 2019. There is also no evidence in the record showing that Plaintiff saw Dr. Woodruff prior to surgery or Dr. Woodruff's findings or recommendations.

[13] That same day, the Court granted in part Plaintiff's motion for a preliminary injunction filed on January 16, 2019; the Court required that Plaintiff see an orthopedic knee specialist on an urgent basis and that Corizon provide an MRI or other tests recommended or ordered by the specialist as well as any medical equipment recommended or prescribed by the specialist. (Doc. 48.) At that time, the Court only had certain medical records through December 12, 2018 and Plaintiff's averment that Corizon's Utilization Management Team had denied NP McElroy's January 29, 2019 request for an MRI. (*Id*.)

1    On April 5, 2019, Plaintiff saw NP Ende for "H&P/EKG for pre-op." (*Id*. at 211.)

2  Ende noted that Plaintiff's physical exam was normal except for his left knee, that his ECG

3  was normal, and Plaintiff was cleared for surgery. (*Id*. at 212, 214.)

4    On April 23, 2019, Dr. Paul submitted an urgent Consultation Request for off-site

5  orthopedics, noting that Plaintiff had been seen by orthopedics with the recommendation

6  for a "total knee replacement refer to Dr. Woodruff." (Doc. 57 at 28.) Dr. Paul wrote that

7  Plaintiff "needs an urgent office visit prior to surgery[.] The surgery has already been

8  authorized." (Doc. 57 at 28.) The request was referred to the UM Team. (*See id*.)

9    Defendants assert that Plaintiff had an off-site consult with an orthopedic surgeon

10  on May 1, 2019, that a total knee arthroplasty was recommended, and that Plaintiff was

11  prescribed Percocet 5/325, which Dr. Paul substituted with Tramadol. (Doc. 89 ¶ 63.)

12  Defendants do not submit the record from the orthopedic surgeon but only provide the

13  Consultation Request Action on which Dr. Paul commented, "I see no benefit for

14  nonsurgical treatment[.] [P]lan: follow orthopedic surgeon's recommendations however

15  will substitute tramadol for Percocet as it is not formulary." (Doc. 89-1 at 220.)

16    June 30, 2019 was the last day Corizon was the provider of healthcare services at

17  certain ADC facilities. (Doc. 89 ¶ 64.)

18    On July 1, 2019, Plaintiff had left total knee replacement surgery by Dr. Woodruff

19  at Banner Baywood Medical Center in Mesa, Arizona.[14] (*Id*. ¶ 65; Doc. 106-1 at 120.)

20  **IV.    Eighth Amendment**

21    Under the Eighth Amendment, a prisoner must demonstrate that a defendant acted

22  with "deliberate indifference to serious medical needs." *Jett v. Penner*, 439 F.3d 1091,

23  1096 (9th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). There are two

24  prongs to the deliberate-indifference analysis: an objective prong and a subjective prong.

25  First, a prisoner must show a "serious medical need." *Jett*, 439 F.3d at 1096 (citations

26

27    [14] Although Plaintiff's post-surgery care was the subject of one of Plaintiff's
motions for injunctive relief, the parties did not submit evidence of Plaintiff's post-surgery

28  care in their summary judgment briefing, and Plaintiff did not argue in his summary
judgment response that anyone involved in his post-surgery care was deliberately
indifferent to his serious medical needs.

omitted).  A "'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal citation omitted).  Examples of a serious medical need include "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *McGuckin*, 974 F.2d at 1059-60.

Second, a prisoner must show that the defendant's response to that need was deliberately indifferent. *Jett*, 439 F.3d at 1096.  "Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004).  "Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action." *Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980) (citing *Estelle*, 429 U.S. at 105-06).  Even gross negligence is insufficient to establish deliberate indifference to serious medical needs. *Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990).  Instead, an official acts with deliberate indifference if he "knows of and disregards an excessive risk to inmate health or safety; to satisfy the knowledge component, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment," *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002) (internal citations and quotation marks omitted), or when they fail to respond to a prisoner's pain or possible medical need. *Jett*, 439 F.3d at 1096. "A difference of opinion does not amount to deliberate indifference to [a plaintiff's] serious medical needs." *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989).  A mere delay in medical care, without more, is insufficient to state a claim against prison officials for deliberate indifference. *See Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404,

1    407 (9th Cir. 1985).  The indifference must be substantial.  The action must rise to a level

2    of "unnecessary and wanton infliction of pain."  *Estelle*, 429 U.S. at 105.

3    **V.      Discussion**

4            **A.      Serious Medical Need**

5            Defendants do not argue that Plaintiff's knee injuries, DJD, osteoarthritis, and pain

6    were not serious medical needs.  Plaintiff and his medical records document Plaintiff's

7    complaints of knee injury, pain and arthroscopic surgery going back to 2013 and

8    subsequent diagnoses of chronic knee pain, polytrauma, osteoarthritis, DJD, left knee

9    deformity, fracture of medial plateau of left tibia, and total knee replacement surgery in

10   2019.

11           This record supports that Plaintiff suffered a serious medical need.  The analysis

12   therefore turns to the deliberate-indifference prong.

13           **B.      Deliberate Indifference**

14                   **1.      Defendant Elijah**

15           Defendants argue that Elijah assessed Plaintiff once, communicated his x-ray results

16   to him and told him no abnormal bone fragments were identified but there were

17   degenerative changes, and she offered Plaintiff non-narcotic alternatives to the narcotic

18   pain relievers he requested.  (Doc. 88 at 22.)  Plaintiff argues that when he saw Dr. Elijah

19   he complained of bone-on-bone grinding inside his knee and that "logic dictates that

20   reasonable medical staff would prescribe pain medication that was actually use[d] to

21   control serious pain," but she did not, and she did not "begin a referral to the Corizon

22   Utilization Management unit for a specialist off-site appointment."  (Doc. 105 at 25.)

23   Plaintiff contends that Dr. Elijah's inadequate treatment "was as if no treatment was

24   prescribed at all."  (*Id.*)

25           The record reflects that Plaintiff saw Dr. Elijah once—on June 7, 2017.  Dr. Elijah

26   examined Plaintiff, noted an obvious deformity in the left knee, swelling, and limited

27   ROM.  (Doc. 89-1 at 66.)  Although Plaintiff requested Tylenol #3, Tramadol, Gabapentin

28   or Baclofen, Dr. Elijah found no medical indication for those medications and offered

Plaintiff alternatives such as Nortriptyline, Cymbalta and NSAIDs.  (*Id*.)  Plaintiff requested Ibuprofen, which Dr. Elijah prescribed, along with capsaicin cream, and she ordered labs, including a rheumatoid profile, and a left knee brace.  (*Id*. at 68.)  Dr. Elijah planned to get Plaintiff's medical records from Oklahoma and then discuss a plan of care with Plaintiff.  (*Id*.)

Plaintiff's one encounter with Dr. Elijah was an isolated incident, and for an isolated incident to rise to deliberate indifference, it must be egregious in nature.  *McGuckin*, 974 F.2d at 1060-61 (repeated failure to properly treat a prisoner or a single failure that is egregious strongly suggests deliberate indifference); *Wood*, 900 F.2d at 1334 ("[i]n determining deliberate indifference, we scrutinize the particular facts and look for substantial indifference in the individual case, indicating more than mere negligence or isolated occurrences of neglect").  "[T]he more serious the medical needs of the prisoner, and the more unwarranted the defendant's action in light of those needs, the more likely it is that a plaintiff has established 'deliberate indifference' on the part of the defendant."  *McGuckin*, 974 F.2d at 1061.

Here, there is no evidence that Dr. Elijah's actions were egregious or rose to the level of deliberate indifference to Plaintiff's serious medical needs.  Dr. Elijah did one exam of Plaintiff and planned to get Plaintiff's medical records from Oklahoma to further develop a plan of care.  In the meantime, she prescribed pain relievers—albeit not what Plaintiff wanted—ordered labs and a knee brace.  There is no evidence that Dr. Elijah knew of and disregarded an excessive risk to Plaintiff's health or safety or that she failed to respond to Plaintiff's pain or possible medical need.  Plaintiff's disagreement with the treatment he received does not constitute deliberate indifference because there is no evidence in the record that the treatment he received on this one occasion was "medically unacceptable" under the circumstances.  *Colwell v. Bannister*, 763 F.3d 1060, 1068 (9th Cir. 2014).  While there is no evidence that Dr. Elijah ever contacted Oklahoma to obtain Plaintiff's medical records, this failure may be evidence of negligence but it does not rise to the level of deliberate indifference.

1    Accordingly, based on this record, there is no genuine issue of material fact and the

2    Court will grant summary judgment to Defendant Elijah.

3                    **2.    Defendant Bass**

4            Defendants argue that NP Bass was consistently responsive to Plaintiff's medical

5    needs and there is no showing that NP Bass's course of treatment was medically

6    unacceptable or that he chose that course of treatment in a conscious disregard of an

7    excessive risk to Plaintiff.  (Doc. 88 at 20.)  Plaintiff responds that Bass should have

8    appealed the ATPs, but did not, and instead prescribed Ibuprofen and Imipramine, "an

9    anxiety pill, which did not stop Plaintiff's pain and suffering." (Doc. 105 at 28.)  He also

10   argues that treatment "was tactically denied because Corizon staff Elijah then Bass were

11   waiting on the mythical medical records from Oklahoma" while he suffered tremendous

12   pain. (*Id.* at 27.)  And, he contends that if his knee had been treated earlier than July 2019,

13   it is possible only part of his knee would have needed to be replaced, and he appears to

14   argue that he might not have developed arthritis in the back, hip and knee.  (*Id.*)

15          The record reflects that Plaintiff saw NP Bass four times.  At an October 17, 2017

16   appointment, Bass noted Plaintiff's report of left leg chronic pain, numbness, tingling,

17   weakness and gait problems, and upon examination, noted no clubbing/ cyanosis,

18   deformity, edema and full ROM. (Doc. 89-1 at 98.)  Bass assessed Plaintiff as "clinically

19   stable" with a left knee deformity, and at Plaintiff's request, prescribed Indomethacin,

20   which was in addition to Plaintiff's current prescriptions for Ibuprofen 600 mg three times

21   daily, Imipramine 25 mg daily, and capsaicin cream.  (*Id.*)  At a January 30, 2018

22   appointment, Plaintiff was unable to extend his knee to 180 degrees or flex his knee to 90

23   degrees, there was no erythema or effusion, and Bass noted a "marked deformity." (*Id.* at

24   107.)  Bass noted that he had requested Plaintiff's Oklahoma medical records and he

25   planned to check on that request and to initiate a consult request for an MRI if the previous

26   imaging from Oklahoma did not arrive. (*Id.* at 107.)  Bass re-prescribed Ibuprofen 600 mg

27   three times daily. (*Id.*)  On March 11, 2018, Bass submitted a consultation request for an

28   off-site MRI, but the request was denied and the ATP said to continue attempts to obtain

1   the prior MRI report.  (*Id.* at 110.)  Plaintiff's last visit with Bass was on June 5, 2018;
2   Bass noted that his prior request for an MRI was "ATP'd" and so he submitted a
3   consultation request for an off-site orthopedics evaluation, but that request was also denied
4   in favor of an ATP of "conservative management options."  (*Id.* at 122, 125-128)

5   Plaintiff has not presented any evidence that Bass's failure to appeal the two ATPs
6   was medically inappropriate or in deliberate indifference to Plaintiff's serious medical
7   needs.  The record reflects that Bass consistently addressed Plaintiff's concerns and
8   attempted to get further testing and an outside orthopedics consultation for Plaintiff, but
9   those requests were denied.  Also, Plaintiff does not present any evidence, other than his
10  speculation, to support that he might not have needed a total knee replacement or that he
11  would not have developed other issues if his knee had been treated sooner.  In fact, Plaintiff
12  has consistently asserted that an orthopedic doctor in Oklahoma told him in 2015 that he
13  needed a total knee replacement.

14  Thus, based on this record, there is no evidence that NP Bass knew of and
15  disregarded an excessive risk to Plaintiff's health or safety or that he failed to respond to
16  Plaintiff's pain or possible medical need, and the Court will grant summary judgment to
17  Defendant Bass.

18  **3.      Defendant Ende**

19  Defendants argue that Plaintiff has not shown that Ende repeatedly failed to treat
20  him properly and Plaintiff suffered no injury attributable to Ende's alleged failure to
21  provide treatment.  (Doc. 88 at 21-22.)  Plaintiff responds that when he saw Ende on June
22  26, 2018, Ende saw how "grossly deformed his left knee was with crepitis" but he failed
23  to appeal the denial of the consultation request for an orthopedic evaluation and ATP of a
24  home exercise program.  (Doc. 105 at 30.)

25  The record reflects that Ende reviewed x-rays taken of Plaintiff's left knee on May
26  6, 2017, which showed "[n]o fracture or destructive process.  Pending AP view.
27  Degenerative changes in lateral view presented." (Doc. 89-1 at 45.)  Ende noted the x-rays
28  were "abnormal, no action indicated."  (*Id.*)  Between October 2017 and June 2018,

Plaintiff submitted at least five HNRs about his pain and the ineffectiveness of the medications he had been prescribed for pain, and at every provider visit during that time period Plaintiff described his pain, usually rating it at 8/10 and sometimes 10/10, and he complained about the ineffectiveness of his pain medications.  The record further reflects that Ende saw Plaintiff on June 26, 2018 and Ende noted that Plaintiff's left knee was "grossly deformed, ROM extension 180 degrees, flexion 90 degrees, crepitus with movement, ambulates with limp using cane.  (*Id*. at 130.)  Ende told Plaintiff at that visit that the consultation request for an orthopedic evaluation had been denied and Ende ordered x-rays of Plaintiff's left knee.  (*Id*.)  The x-rays showed degenerative changes and "prior avulsion," but no acute changes compared to x-rays taken September 11, 2017, and Nancy Ochoa, who apparently took the x-rays, noted "externally visual appearance is grossly deformed compared with right knee."  (*Id*. at 134.)  Ende's review of the x-ray report states, "abnormals noted, no urgent action required" and that he "will review results with patient at next chronic care visit."  (*Id*.)  After that Plaintiff submitted HNRs addressed to Ende on July 6 and July 8, 2018 regarding his extreme pain and inability to do the knee conditioning program, and the responses from RN McDuffee stated that the x-rays required no urgent action, that Ende would discuss the issue at Plaintiff's next chronic care visit, and that Plaintiff was seen by the provider on June 26 for this.  (*Id*. at 136; Doc. 106-1 at 101.)  Plaintiff filed another HNR on September 16, 2018 about his unbearable knee pain, his need for a wheelchair, and begging for help.  (*Id*. at 138.)  The response from RN McDuffee states that Plaintiff was scheduled with a provider.  (*Id*.)

Based on this record, there is a genuine issue of material fact whether Defendant Ende was deliberately indifferent to Plaintiff's serious medical needs.  First, Defendants do not explain why, even though Ende noted that two of Plaintiff's x-rays were "abnormal," no action was required.  Second, Plaintiff's medical record is replete with Plaintiff's complaints of extreme pain both to various providers and in HNRs, some of which were addressed to Ende.  The inference can be made that the Ende was aware of these HNRs and Plaintiff's pain complaints and yet Ende took no action with respect to Plaintiff's

complaints of severe pain.  *See Jett*, 439 F.3d at 1094, 1097 (finding that as the party opposing summary judgment, the plaintiff was entitled to an inference that the defendant prison doctor was aware of the medical slips the plaintiff continued to submit asking to be sent to a specialist for treatment for a fractured thumb).

Accordingly, the Court will deny summary judgment to Defendant Ende.

### 4.   Defendant Corizon

To support a § 1983 claim against a private entity performing a traditional public function, such as providing medical care to prisoners, a plaintiff must allege facts to support that his constitutional rights were violated as a result of a policy, decision, or custom promulgated or endorsed by the private entity.  *See Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1138-39 (9th Cir. 2012) (extending the "official policy" requirement for municipal liability under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978), to private entities acting under color of law).   Under *Monell*, a plaintiff must show: (1) he suffered a constitutional injury; (2) the entity had a policy or custom; (3) the policy or custom amounted to deliberate indifference to the plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the constitutional injury.  *See Monell*, 436 U.S. at 691-94; *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110-11 (9th Cir. 2001).

### a)   Constitutional Injury

Defendants argue that Plaintiff cannot show any actual injury attributable to any Corizon and that his chronic knee pain was continuously and appropriately assessed and treated by medical providers, first with conservative measures and then with surgery "when it was determined surgical intervention was medically appropriate (Doc. 88 at 28.) Defendants contend that "[w]hile Plaintiff alleges that surgical intervention should have been provided sooner without attempting conservative measures first, Plaintiff has provided no evidence that this course was medically appropriate [sic] or that the course taken by a multitude of medical providers was not medically appropriate."  (*Id.*)

As set forth above, to support an Eighth Amendment violation, a prisoner must demonstrate a serious medical need and deliberate indifference to that need. *Jett*, 439 F.3d at 1096. As the Court previously found, the record supports that Plaintiff had a serious medical need and there is a question of fact whether Defendant Ende was deliberately indifferent to that need.

Moreover, Defendants ignore the evidence that while Plaintiff was in Oklahoma, he did try physical therapy in December 2015, which left him in such pain that he could not walk or hobble anywhere. (Doc. 106 at 6.) Plaintiff saw an orthopedic surgeon around that same time because Dr. Balogh submitted a Consult Request for an orthopedic surgery consultation on October 4, 2016, noting that an orthopedist in Ada, Oklahoma had recommended left total knee replacement in December 2015 and that ODC would need approval from Arizona to proceed with any surgery. Once Plaintiff returned to Arizona in April 2017, it took another two years before Plaintiff finally had an off-site orthopedics appointment on March 19, 2019 and knee replacement surgery on July 1, 2019, three and a half years after the initial recommendation for knee replacement surgery. In the meantime, Plaintiff was continually reporting to providers the extreme pain he was in, difficulties ambulating and performing his ADLs, and nearly every provider noted the deformity in Plaintiff's knee, decreased mobility and ROM and difficulty with ADLs, and several providers sought MRIs and an orthopedics appointment and almost all those requests were denied by unknown persons.

A reasonable jury could find that this delay in treatment was in deliberate indifference to Plaintiff's serious medical needs. *Wood*, 900 F.2d at 1334. A reasonable jury could also find that Plaintiff was harmed by the years-long delay in receiving knee replacement surgery and the intervening years of pain, loss of mobility, and difficulties in performing his ADLs. *See Jett*, 439 F.3d at 1096; *see Hunt v. Dental Dep't*, 865 F.2d 198, 200 (1989) (delay in providing medical treatment does not constitute Eighth Amendment violation unless delay was harmful). The fact that Plaintiff was seen regularly by medical staff does not prevent a finding a deliberate indifference. *See Lopez v. Smith*, 203 F.3d

1122, 1132 (9th Cir. 2000) (prisoner does not have to prove that he was completely denied medical care).  A failure to competently treat a serious medical condition, even if some treatment is prescribed, may constitute deliberate indifference in a particular case.  *Ortiz v. City of Imperial*, 884 F.2d 1312, 1314 (9th Cir. 1989) ("access to medical staff is meaningless unless that staff is competent and can render competent care"); *see Estelle*, 429 U.S. at 105 & n.10 (the treatment received by a prisoner can be so bad that the treatment itself manifests deliberate indifference).

In light of the above, there is a question of fact whether Plaintiff suffered a constitutional injury, thereby satisfying the first prong under *Monell*.

### b)      Policy or Custom

A policy is "a deliberate choice to follow a course of action" made by the officials or entity "responsible for establishing final policy with respect to the subject matter in question."  *Oviatt v. Pearce*, 954 F.2d 1470, 1477 (9th Cir. 1992).  A policy can be one of action or inaction.  *Long v. Cnty. of L.A.*, 442 F.3d 1178, 1185 (9th Cir. 2006).  A "custom" for purposes of municipal liability is a "widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well-settled as to constitute a custom or usage with the force of law."  *St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988).  "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy."  *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).  While one or two incidents are insufficient to establish a custom or practice, the Ninth Circuit has not established what number of similar incidents would be sufficient to constitute a custom or policy.  *See Oyenik v. Corizon Health Inc.*, No. 15-16850, 2017 WL 2628901, at *2 (9th Cir. June 19, 2017) (a reasonable jury could conclude that at least a dozen instances of defendant Corizon denying or delaying consultations and radiation treatment for cancer patient over a year amounts to a custom or practice of deliberate indifference) (citing *Oviatt*, 954 F.2d at 1478).  But "[t]here is no case law indicating that a custom cannot be inferred from a pattern of behavior toward a

single individual." *Id.* Whether actions by entity officers or employees amount to a custom "depends on such factors as how longstanding the practice is, the number and percentage of officials engaged in the practice, and the gravity of the conduct." *Mi Pueblo San Jose, Inc. v. City of Oakland*, C-06-4094 VRW, 2006 WL 2850016, at *4 (N.D. Cal. Oct. 4, 2006).

Defendants argue that Plaintiff has not provided any evidence that a total knee replacement was ever recommended by any provider in Oklahoma or that Corizon refused to pay for this total knee replacement and that the record reflects that conservative measures were recommended prior to any surgical intervention. (Doc. 88 at 26.) Defendants further argue that Corizon employees "were consistently responsive to Plaintiff's medical needs, that he was continually assessed and his pain was managed through medication, a home exercise program, physical therapy and eventually surgical intervention." (*Id.* at 27.)

Defendants again ignore the evidence that an orthopedist in Ada, Oklahoma recommended total knee replacement surgery in December 2015. While the medical record with the actual recommendation is not in evidence, Dr. Balogh noted in Plaintiff's medical record that he saw the recommendation for total knee replacement and he submitted a Consult Request for an orthopedic surgery consultation on October 4, 2016, noting that an orthopedist in Ada, Oklahoma had recommended left total knee replacement in December 2015 and that ODC would need approval from Arizona to proceed with any surgery. Plaintiff also avers that a specialist in Oklahoma told him on December 21, 2016 that he needed a complete knee replacement because his left knee was shot, with big pieces of broken bone, and ligaments that could not be reattached. Moreover, Defendants do not address the fact that multiple medical providers sought MRIs and an orthopedics consultation in the years before Plaintiff had surgery in 2019 and that those requests were denied by unknown individuals, presumably on the Utilization Management team, and there is no evidence before the Court that the person(s) denying the consultation requests were actually medical providers, that they ever examined Plaintiff, or that their decisions were medically appropriate. This evidence raises a disputed issue of material fact as to

whether Corizon had a custom or practice in delaying or denying treatment recommended by its providers and deferring to ATPs for non-medical reasons.  A reasonable jury could conclude that the delay in getting Plaintiff to a specialist and denials of providers' consultation requests for more advanced diagnostic tests and specialist care over a period of years were not the exception to the policy, but the rule, and thereby constituted a custom or practice of deliberate indifference that was the moving force behind the constitutional violation.  *See Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1194-95 (9th Cir. 2002) (whether a policy or custom exists is normally a jury question).

### c)     Policy or Custom Amounts to Deliberate Indifference

Because deliberate indifference is exhibited where prison officials deny or delay medical treatment and harm results, *see Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990) and *Hunt*, 865 F.2d at 200, an ongoing policy or practice that denies or delays treatment for serious medical needs and thereby causes injury would constitute a deliberately indifferent policy.  It is undisputed that Plaintiff did not receive the surgery that had been recommended by specialists in December 2015 and December 2016 until July 2019.  In light of the evidence showing that orthopedic specialists recommended knee replacement surgery in December 2015 and December 2016 and that requests by multiple medical providers for further diagnostic testing and specialist evaluations were denied by unknown individual(s), a reasonable jury could conclude that Corizon had a policy of delaying surgery for non-medical reasons.  Thus, the Court finds there is a genuine issue of material fact whether Corizon had a policy, custom or practice amounting to deliberate indifference to Plaintiff's serious medical needs.

### d)     Moving Force Behind Violation

To establish that a policy or custom is the "moving force" behind a constitutional violation, a plaintiff must demonstrate a direct causal link between the policy or custom and the constitutional deprivation.  *See Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 404 (1997).  A plaintiff must show that had the policy or practice been different, the injury would have been avoided.  *Oviatt*, 954 F.2d at 1478.

The evidence in the record demonstrates that Plaintiff's knee pain, mobility, and ability to perform ADLs worsened between 2015 and 2019.  However, the parties have not presented any evidence regarding whether Plaintiff's condition would not have deteriorated, or would not have deteriorated to the same degree, if he had had the left total knee replacement before July 2019.  Based on the evidence in the record, the Court finds there is a genuine issue of material fact with respect to whether Corizon's pattern and practice was the "moving force" behind Plaintiff' s injuries.

In sum, there are genuine issues of material fact whether Plaintiff suffered a constitutional deprivation and whether Corizon had a policy or custom that amounted to deliberate indifference and was the moving force behind the violation.  Accordingly, the Court will deny summary judgment to Corizon.

### 5.    Defendants Ryan and Pratt

Defendants argue in part that Plaintiff's claims against Ryan and Pratt are moot because Plaintiff cannot maintain a lawsuit for damages against Ryan or Pratt in their official capacities and may only maintain a lawsuit against Ryan and Pratt for prospective injunctive relief.  (Doc. 88 at 23.)

Defendant Shinn, who is the current Director of the ADC, was later substituted for Defendant Ryan as to the official capacity claims against Defendant Ryan.  Plaintiff's request for injunctive relief as to these claims is moot because Plaintiff received the relief that he sought in his Complaint—to be sent to an orthopedic specialist and that Defendants follow the specialist's recommendations.  Plaintiff was sent to an orthopedic specialist in 2019 and had a total knee replacement on July 1, 2019.  Thus, his claim against Shinn and Pratt for injunctive relief is moot.

Although there is an exception to the mootness doctrine for claims that are capable of repetition, yet evade review, that exception is limited to cases where the duration of the challenged action is too short to be fully litigated before it ceases, and where there is a reasonable expectation that the plaintiff will be subjected to the same action again.  *Alvarez*

*v. Hill*, 667 F.3d 1061, 1064 (9th Cir. 2012).  There is no indication that Plaintiff will again be subject to the same action because he has received a total knee replacement.

Likewise, although an exception to mootness has been recognized where a plaintiff is challenging ongoing policies to which others will continue to be subject, the Ninth Circuit Court of Appeals has not extended this exception beyond "short-lived pretrial proceedings in criminal prosecutions, where civil class actions would not be conducive to obtaining the relief sought." *Id.* at 1065.

Accordingly, because Plaintiff's claim for prospective injunctive relief against Shinn and Pratt is moot, the court will grant summary judgment to Shinn and Pratt.

## VI.   Motion for Preliminary Injunction

### A.   Relevant Facts

Following his knee replacement surgery on July 1, 2019, Plaintiff had a number of issues during recovery such as not receiving post-surgery medical ice and physical therapy, and the Court set forth those issues in a December 23, 2019 Order denying Plaintiff's request for injunctive relief because he eventually received physical therapy and ice after filing his motion.  (*See* Doc. 108.)  On January 6, 2020, Plaintiff filed a Motion for Reconsideration of that Order (Doc. 109), which the Court denied, but the Court construed Plaintiff's assertions that his knee had not healed property, that he could not walk or stand on it, and his request to see a knee specialist for his ongoing issues as a new motion for preliminary injunction and required Defendants to respond to the new motion.  (Doc. 111.)

Defendants responded on January 29, 2020 with a Declaration from Wendy Orm, MD, who is the Statewide Medical Director for Centurion.  (Doc. 112-1 at 2–3.)  Orm reviewed Plaintiff's medical records, noting that after his surgery, he had eight physical therapy sessions, and on December 10, 2019, a request for an orthopedic follow-up appointment was submitted due to Plaintiff's complaints of increasing pain.  (*Id.* ¶¶ 5-8.)  Orm said that appointment was scheduled for the first week of February with the same specialist who performed Plaintiff's knee surgery.  (*Id.* ¶ 9.)  Defendants later submitted a medical record showing that Plaintiff saw NP Furar on January 23, 2020, where he reported

that from his left knee down he had a "burning & pulsating, sometimes spasming pain." (Doc. 113-1 at 18.)  Upon examination, Furar noted that Plaintiff's gait was normal and he was ambulating without assistance, that there was swelling to the left knee and it was warm to touch, but no redness, and decreased ROM.  (*Id*.)  Furar's plan was to discontinue Tramadol per Plaintiff's request and to prescribe Baclofen and contact the clinical coordinator to get an orthopedic follow up scheduled.  (*Id*. at 19.)

Plaintiff stated in his supplemental reply that that he saw the surgeon on February 7, 2020, who took x-rays and told Plaintiff that the left knee bone had collapsed under the hardware.  (Doc. 116 at 4.)  Plaintiff said the surgeon sent a test kit for Centurion to check for infection, but Centurion had not tested Plaintiff's knee for infection as of February 11, 2020.  (*Id*.)  Plaintiff said he was in level 10 pain with a broken knee and neither Centurion nor Shinn had done anything to get his knee repaired.  (*Id*.)  Plaintiff also said he was not receiving his pain medication, Gabapentin, three times daily as prescribed, but only received it twice daily crushed in water, which interfered with the time-delay release of the drug and left Plaintiff without any pain relief after two hours.  (*Id*.)

Because of the new issues raised in Plaintiff's supplemental reply, the Court, on March 11, 2020, stayed a ruling on the new motion for injunctive relief and required Defendants to file a supplemental brief with recent medical records, including those of his visit with the specialist, and to address Plaintiff's evidence that he is not receiving his Gabapentin as prescribed.  (Doc. 119.)  The parties have now filed their supplemental briefing.

Plaintiff saw Physician's Assistant Whatcott at Banner Health on February 6, 2020; when Whatcott examined Plaintiff's left knee, he noted "tenderness along the medial aspect of the knee, the knee appears to be in varus alignment, no erythema, slight increased warmth about the knee, mild effusion, flexion is to 90 degree with 15 degrees shy of full extension, 15 degree extensor lag, passively able to fully extend . . . ."  (Doc. 122-1 at 22.)  Whatcott assessed Plaintiff with "failed total left knee replacement" and he recommended

labs, aspiration of the knee to rule out infection, and a "revision total knee arthroplasty." (*Id*. at 23.)

On February 13, 2020, NP Furar submitted a Consultation Request for orthopedics for joint aspiration. (Doc. 122-1 at 9.) The request was approved on March 18, 2020. (*Id*. at 10.)

Dr. Paul states in a Declaration dated April 3, 2020 that the knee aspiration was ordered and approved and that she "entered the revision of the total knee arthroplasty yesterday as an urgent consult." (Doc. 122-2 at 2 ¶¶ 6–7.) Defendants also submit a medical record showing Plaintiff had a prescription order dated January 3, 2020 for Gabapentin 600 mg, one tablet twice daily "By Mouth Crushed in Water/Watch Swallow." (*See* Doc. 122-1 at 4.)

### B.     Legal Standard

"A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam); *see also Winter v. Natural Res. Def. Council, Inc*., 555 U.S. 7, 24 (2008) (citation omitted) ("[a] preliminary injunction is an extraordinary remedy never awarded as of right"). A plaintiff seeking a preliminary injunction must show that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm without an injunction, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20. "But if a plaintiff can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips sharply in the plaintiff's favor,' and the other two *Winter* factors are satisfied." *Shell Offshore, Inc. v. Greenpeace, Inc*., 709 F.3d 1281, 1291 (9th Cir. 2013) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)). Under this serious questions variant of the *Winter* test, "[t]he elements . . . must be balanced, so that a stronger

showing of one element may offset a weaker showing of another."  *Lopez*, 680 F.3d at 1072.

Regardless of which standard applies, the movant "has the burden of proof on each element of the test."  *See Envtl. Council of Sacramento v. Slater,* 184 F. Supp. 2d 1016, 1027 (E.D. Cal. 2000).  Further, there is a heightened burden where a plaintiff seeks a mandatory preliminary injunction, which should not be granted "unless the facts and law clearly favor the plaintiff."  *Comm. of Cent. Am. Refugees v. INS*, 795 F.2d 1434, 1441 (9th Cir. 1986) (citation omitted).

The Prison Litigation Reform Act imposes additional requirements on prisoner litigants who seek preliminary injunctive relief against prison officials and requires that any injunctive relief be narrowly drawn and the least intrusive means necessary to correct the harm.  18 U.S.C. § 3626(a)(2); *see Gilmore v. People of the State of Cal*., 220 F.3d 987, 999 (9th Cir. 2000).

**C.     Discussion**

The Court will deny Plaintiff's motion for injunctive relief because he has received the specific relief he requested—to see a knee specialist for issues that arose after his July 1, 2019 total knee replacement.  As to Plaintiff's complaints about his Gabapentin, Defendants have presented evidence that the medication was prescribed as watch/swallow and to be crushed in water.  Plaintiff has not presented any evidence showing that this administration was inappropriate for his needs.

Accordingly, the Court will deny Plaintiff's request for injunctive relief.

**IT IS ORDERED:**

(1)     The reference to the Magistrate Judge is withdrawn as to Defendants' Motion for Summary Judgment (Doc. 91) and Plaintiff's motion for injunctive relief (Doc. 109).

(2)     Plaintiff's motion for injunctive relief (Doc. 109) is **denied**.

(3)     Defendants' Motion for Summary Judgment (Doc. 91) is **granted in part and denied in part**.  The Motion is **granted** as to Defendants Elijah, Bass, Pratt, and Shinn

and they are **dismissed from this action with prejudice**.  The Motion is **denied** as to Defendants Ende and Corizon.

(4)     This action is referred to United States Magistrate Judge Michelle H. Burns (selected by random draw) to conduct a Settlement Conference.

(5)     Counsel are directed to jointly contact the chambers of Judge Burns by emailing burns_chambers@azd.uscourts.gov or calling (602) 322-7610 no later than ten (10) days from the date of this order to schedule a Settlement Conference and for instructions regarding preparation for the conference.

Dated this 29th day of May, 2020.


_Michael T. Liburdi_
Michael T. Liburdi
United States District Judge